## COURT OF APPEALS
## DECISION
## DATED AND FILED

## February 5, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.** **2019AP855** | **Cir. Ct. No. 2017JV201** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT II** |

IN THE INTEREST OF D.I.G., A PERSON UNDER THE AGE OF 17:

STATE OF WISCONSIN,

    PETITIONER-RESPONDENT,

  V.

D.I.G.,

    RESPONDENT-APPELLANT.

        APPEAL from orders of the circuit court for Racine County:  FAYE M. FLANCHER, Judge.  *Affirmed*.

¶1    GUNDRUM, J.[1]    D.G. appeals from a dispositional order adjudicating him to be a delinquent child and requiring that he register as a sex offender and from the order denying his postdisposition motion to stay that portion of the dispositional order requiring him to register as a sex offender.  For the following reasons, we affirm.

## *Background*

¶2    The State filed a delinquency petition charging then twelve-year-old D.G. with first-degree sexual assault of his seven-year-old half sister, a child under the age of twelve.  Among other things, the petition alleged that D.G. took off his sister's underwear and began to penetrate her vagina with his penis.  According to the petition, D.G. admitted touching his sister's vagina with his penis but stated that he did not put it into her vagina.  The sister told a sexual assault nurse that D.G. put his penis "down in there," and the nurse observed that while her hymen was intact, "there were abrasions on the side which are indicative of some type of penetration having occurred."

¶3    D.G. pled to an amended charge of second-degree sexual assault of a child.  At disposition, the State and a social worker asked for, among other things, sex-offender registration for D.G., but D.G.'s counsel asked the court to "hold that issue open" in light of his age and cooperation and to "see how he is performing."  The circuit court ordered supervision for one year and that D.G. cooperate with a psychological or psychiatric evaluation, take all prescribed medications, attend

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

counseling, complete sex-offender treatment, and continue his placement at a treatment facility. The court also ordered that D.G. register as a sex offender.

¶4    The circuit court stated that it was ordering sex-offender registration due to "all of the circumstances." It expressed concern that D.G. "initially denied penetration," yet "[i]t was clear … from the nurse that examined [D.G.'s sister] that while her hymen was intact, there were abrasions on the side which were indicative of penetration having occurred." The court stated: "Given the very serious nature, given the fact that penetration did occur, sex offender registration is appropriate." The court added: "I think [D.G.] has a lot of therapy that he needs to engage in."

¶5    One year later, on the date the dispositional order expired, D.G. filed a postdisposition motion seeking a stay of the sex-offender registration requirement. At a hearing on the motion, D.G.'s counsel noted that D.G. was only twelve years old at the time of the offense and that he had done "everything that I think we would want him to do" since that time, including engaging in sex-offender treatment and "many types of therapy" and "compl[ying] with all the conditions of his disposition order." Counsel also emphasized the opinion of a psychologist, whose report had been submitted to the court, indicating sex-offender registration was not appropriate for D.G. The State asked the court to deny the motion, which it did.

¶6    In denying the motion, the court began by noting the five-year age difference between D.G. and his sister and the fact that he had "penetrat[ed]" her. The court then focused on concern that D.G. still posed a potential future risk. On this point, the court noted that D.G.'s expert report indicated that D.G. has

"learned what to do and what not to do when he, quote, gets the urge." The court continued:

> That was a red flag to me, because that indicates that [D.G.] is still getting urges…. I'm again quoting, [D.G] told this examiner he has learned that if he gets a wrong sexual urge, he has to take a time out because it is important to avoid being impulsive. He engages in appropriate self-talk, quote, say no, it is a bad idea, end quote. He should, quote, discipline yourself to don't do it, end quote. He should tell himself, quote, if I do it, I will get in trouble, end quote. If the person he feels like having sex with is close to him, he should, quote, move or go somewhere else.
>
> There's no indication in the doctor's report what the frequency of [D.G.'s] urges are, whether these urges are still felt toward his little [sister].
>
> At page 11 the doctor noted that the plan was for [D.G] to continue receiving services and supervision through the Racine County Human Services Department. No indication if that is ongoing or not. And then the doctor talks about the risk assessment and talks about the fact that there are no specific instruments to assess juvenile sexual reoffense. The doctor did go on then to describe … the studies that are out there.
>
> And I will be very honest, I didn't look up any of this research myself to look at it. They talked about a Caldwell study from 2016 that analyzed data sets with a total of 33,783 adolescents. I don't know how many of those kinds of fact scenarios we have here with a half sibling.
>
> Ultimately the doctor concludes that [D.G.'s] sexual offense risk is under three percent, but it is a conclusion that she just doesn't explain how she got there. Again, it's the fact that [D.G], according to this, is still having urges that truly concerns me, and that's exactly why the sex offender registration is so important.
>
> Based upon what I have read in this report ... [D.G.] … please understand what my concerns are, and given all the issues that I have with the report here ... I am denying the motion to stay ….

4

When the court asked if there was "[a]nything else," counsel for D.G. indicated that "[o]n page [six] … of the doctor's report it does indicate that he denied feeling attracted to his sister or other children that age." The court responded to this with "[a]ll right."

## *Discussion*

¶7      When a juvenile, such as D.G., seeks a stay of a sex-offender registration order, it is his burden to prove to the circuit court by clear and convincing evidence that it should be stayed. *See State v. Cesar G.*, 2004 WI 61, ¶51, 272 Wis. 2d 22, 682 N.W.2d 1. On appeal,

> [t]he function of this court is not to exercise discretion in the first instance but to review a circuit court's exercise of discretion. "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purposes of achieving a reasonable determination." An appellate court will affirm a circuit court's discretionary decision as long as the circuit court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach."

*Id.*, ¶42 (citations omitted). A circuit court properly exercises its discretion if it "puts forth a 'rational and explainable' chain of reasoning based on facts in the record." *State v. Richard J.D.*, 2006 WI App 242, ¶12, 297 Wis. 2d 20, 724 N.W.2d 665 (citation omitted).

¶8      D.G. asserts the circuit court's denial of his motion was in error because it was based largely on the court's concern that he was "still having"

sexual "urges."[2] D.G. argues that the court's concern is "clearly erroneous" because it was "in direct conflict with the professional psychologist's (1) assessment that there was 'no evidence [D.G.] has any atypical persistent sexual interest,' (2) risk assessment finding [D.G.] at a sexual offense risk of under 3%, and (3) professional opinion that [D.G.] was not an appropriate candidate for the sex offender registry."

¶9      We see no error.  The psychologist report indicated that D.G. revealed to the psychologist that he was still having "*wrong* sexual urge[s]." (Emphasis added.)  In light of the fact that the entire reason for D.G.'s placement on the sex-offender registry was due to his attempt to have intercourse with his seven-year-old sister when he was twelve years old, it was entirely reasonable for the circuit court to be concerned that D.G. was still having "wrong sexual urge[s]," not just supposedly normal sexual urges of a then thirteen-year-old boy, as D.G. suggests was his meaning.  On this point, we emphasize the key paragraph to which the court referred:

---

[2] D.G. spends six pages of his brief-in-chief discussing six factors a circuit court considers when deciding whether to grant a stay of a sex-offender registration requirement, *see* ***State v. Cesar G.***, 2004 WI 61, ¶50, 272 Wis. 2d 22, 682 N.W.2d 1, and the application of those factors to the facts of this case.  Through these six factors, he argues that sex-offender registration is inappropriate in this case.

In these six pages, D.G. argues as if we were the circuit court making the original decision to order sex-offender registration or the postdisposition decision on his motion to stay the sex-offender registration requirement.  It is the circuit court's responsibility to determine what weight it will give various factors in deciding whether to stay the registration order.  *See* ***State v. J.E.B.***, 161 Wis. 2d 655, 675, 469 N.W.2d 192 (Ct. App. 1991).  We are an error-correcting court.  ***State v. Schumacher***, 144 Wis. 2d 388, 407, 424 N.W.2d 672 (1988).  Because D.G. does not identify in these six pages any specific errors by the circuit court, we do not address these arguments.  As the State articulated in its response brief, "[d]isagreement does not equate to [an erroneous exercise] of discretion."

> [D.G.] told this examiner he has learned if he gets a wrong sexual urge he has to take a time-out, because it is important to avoid being impulsive. He engages in appropriate self-talk- "say no, it is a bad idea." He should "discipline [himself] to don't do it." He should tell himself, "if I do it, I will get in trouble." If the person he feels like having sex with is close to him, he should "move or go somewhere else."

While it of course would seem healthy that D.G. was able to verbalize his sexual concerns to the psychologist, this in no way undermines the court's concern that he still poses a danger due to the "wrong sexual urge[s]" he is experiencing. The report hints that D.G. may have expressed to the psychologist that he at times "feels like having sex with" a person or persons who are "close to him." His then seven-year-old sister was obviously someone "close" to him as she was his half sister living in the same house with him at the time of the assault, and he was left in the home with her without adult supervision. The court was understandably concerned about the "wrong sexual urge[s]" D.G. continues to experience and for that reason alone did not err in denying the motion to stay sex-offender registration.

¶10     D.G. next contends that "the court's finding that [the expert's] report did not indicate 'whether these urges are still felt toward his little [sister]' was clearly erroneous" because on page six of the report, the expert indicated that D.G. reported that he "denied feeling attracted to his sister or other children of her age." D.G. then asserts that "[t]o the extent that the court's concern about whether [D.G.] still experienced 'sexual urges' toward [his sister] or other children still factored into its denial of the motion to stay the registry … this concern was clearly erroneous based on [the expert's] conclusion that [D.G.] did not have any atypical persistent sexual interest."

7

¶11     Again, we disagree with D.G., as the court was not required to stay sex-offender registration simply because D.G.'s expert opined that D.G. did not have "any atypical persistent sexual interest," *see* **State v. Sobonya**, 2015 WI App 86, ¶7, 365 Wis. 2d 559, 872 N.W.2d 134 (stating that a circuit court is "entitled to accept or disregard [an expert's opinion] as it deem[s] appropriate"), especially in light of the report's indication that he continues to have "wrong sexual urge[s]" and its suggestion he may have indicated he sometimes "feels like having sex with [a person or persons] close to him."   The court did not err in disregarding the expert's personal "take" on D.G.'s self-reporting of continued urges of a "wrong sexual" nature and seeing it as a "red flag" that caused it sufficient concern to warrant requiring D.G. to register as a sex offender to assist with public safety. Furthermore, the psychologist's opinion that D.G. does not have "any atypical *persistent* sexual interest" would not act to allay the court's ultimate concern that he did appear to at least have *occasional* "wrong sexual urge[s]."   (Emphasis added.)   And with regard to D.G.'s assertion that "the court's finding that [the expert's] report did not indicate 'whether these urges are still felt toward his little [sister]' was clearly erroneous" because on page six of the report, the expert indicated that D.G. reported that he "denied feeling attracted to his sister or other children that age," this matter was cleared up for the court before conclusion of the motion-to-stay hearing—as the court responded "[a]ll right" after D.G. indicated that "[o]n page [six] … of the doctor's report it does indicate that he denied feeling attracted to his sister or other children that age"—yet this clarification did not alter the court's ruling.

¶12     D.G. also takes issue with the circuit court's statement at the postdisposition hearing that while D.G.'s expert discusses in her report various studies of adolescents, her conclusion that D.G.'s sexual-offense risk is less than

three percent "just doesn't explain how she got there." D.G. points out that the expert stated in the report:

> There is no evidence [D.G.] has any atypical persistent sexual interest. He does not display behaviors consistent with a conduct disorder. He does not present with psychopathic features. His offense against his sister appeared to have come about out of the blue. His mother indicated he was displaying behavior concerns in the days prior to the offending; however, there is no evidence they were criminal-like behaviors, rather they appear to be related to ADHD symptoms.

He points out that the psychologist indicated he completed sex-offender treatment and continues to participate in additional treatment. He directs us to the report's reference to a 2016 "Caldwell" study which, according to the psychologist, "indicate[s] sexual offense base rates had declined over the years: studies from 1980 to 1995 (N=9,106) indicated a mean sexual recidivism rate of 10% over fifty-eight months while studies from 2000 to 2015 (N=20,008) showed a significantly reduced sexual recidivism rate of 3% over forty-four months."

¶13 Again, we see no error. The court recognized, as D.G. also notes, that the report indicated that "there are no specific instruments to assess juvenile sexual reoffense." The court noted that the report referred to a "Caldwell study from 2016 that analyzed data sets with a total of 33,783 adolescents." The court questioned the value of the study as referenced in the report because there was no indication as to "how many of those kinds of fact scenario[s]" dealt with half siblings, as in this case.

¶14 We conclude that the court's questioning of the accuracy of the expert's three-percent conclusion was not unreasonable. Identifying certain factors indicating a person is less likely to reoffend, as the psychologist did, is quite different from explaining how one concludes with specificity and certainty,

as this expert did in her report, that "[D.G.'s] probability of sexual offending is less than 3%." This conclusion by the psychologist appears to be connected to the three-percent rate found in the studies from 2000 to 2015, but the court was not in error in pointing out a statement in the report that "there are no specific instruments to assess juvenile sexual reoffense." Perhaps most significantly, there is no indication that in coming to her "3%" conclusion with regard to D.G., the psychologist specifically considered and factored in the court's most significant concern—that D.G. reported he still has "wrong sexual urge[s]." The court did not err in questioning the psychologist's three-percent number in deciding whether or not to stay sex-offender registration.

¶15 We conclude the court's orders requiring D.G. to register as a sex offender and denying his motion to stay that requirement were entirely reasonable.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.